**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM DIVISION**
www.flsb.uscourts.gov

**In re:**

                                                      **CASE NO. 10-45753-PGH**

**SOJO, LLC,**                                          **Chapter 11**

        **Debtor.**
_____/

**EMERGENCY MOTION BY DEBTOR, SOJO, LLC,**
**FOR ORDER (A) AUTHORIZING THE DEBTOR (1) TO USE**
**CASH COLLATERAL ON AN INTERIM BASIS PURSUANT TO**
**11 U.S.C. §363 AND (2) TO PROVIDE ADEQUATE PROTECTION**
**IN CONNECTION THEREWITH PURSUANT TO 11 U.S.C. §361; AND**
**<u>(B) SETTING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001</u>**
(Emergency Hearing Requested)

**Statement of Exigent Circumstances**

**The above-captioned debtor and debtor-in-possession (the "Debtor") requests an emergency hearing in this matter at the earliest time available on the Court's calendar to insure continuity of the Debtor's business and maximize the value of its collateral. The Debtor respectfully requests that the Court waive the provisions of Rule 9075-1(B) of the Local Rules for the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules"), which requires an affirmative statement that the Debtor made a bona fide effort to resolve the issues raised in this emergency motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.**

        **SOJO, LLC** ("SOJO" or the "Debtor"), as debtor and debtor-in-possession, by and through counsel, and pursuant to 11 U.S.C. §361 and 363 files this Emergency Motion By Debtor, SOJO, LLC, For Order (A) Authorizing the Debtor (1) to use Cash Collateral on an Interim Basis Pursuant to 11 U.S.C. §363 and (2) to Provide Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §361 and (B) Setting a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Motion"). In support of the Motion, the Debtor states, as follows:

**I.**     **BACKGROUND.**

        **A.**     **<u>The Chapter 11 Filing.</u>**

        1.     On November 22, 2010 (the "Petition Date"), the Debtor filed a voluntary petition in

this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtor continues to operate its businesses as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2. No creditors' committee has yet been appointed in this case. In addition, no trustee or examiner has been appointed.

3. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

4. The statutory predicates for the relief requested herein are Sections 105(a), 361 and 363 of the Bankruptcy Code.

### B. Background and Business Operations.

5. SOJO is a Florida limited liability corporation also doing business as SOJO's Munchie Mart, with its principal place of business located in Palm Beach County, Florida.

6. SOJO owns and operates a Sonoco gasoline service station with an onsite convenience store (the "Service Station") located at 130 North Jog Road, in West Palm Beach, Florida (the "Business"). The Service Station's day-to-day operations are currently handled by the Debtor's principals, Amy and Howard Holloway, and a small staff of employees.

7. SOJO is also the fee simple owner of an adjacent lot of land consisting of approximately 2.8 acres located at 90 North Jog Road in West Palm Beach, Florida. The 2.8 acre parcel property is a finished commercial site equipped with pavement, landscape and utilities and is zoned for commercial multiple use planned development (MUPD) (the "Commercial Lot"). The Commercial Lot is immediately available for vertical construction of bank, retail, restaurant, mixed use, office & retail or other similar commercial development. The Service Station and Commercial Lot shall be referred to collectively as the "Properties".

8. The Properties are currently secured by three (3) mortgage liens in favor of PNC Bank, N.A. ("PNC"), as successor in interest to Fidelity Federal Bank & Trust ("Fidelity") and National City Bank ("National City"). In addition, PNC has UCC-1 liens upon the profits, proceeds and cash derived from daily operations of the Business (the "Cash Collateral") and other tangible assets of the Debtor.

9. As of September 2006, according to an appraisal ordered by Fidelity, the Properties had an appraised value of $7,950,000.00 (the "Appraisal"), with $5,350,000.00 attributed to the

Service Station and $2,600,000.00 to the Commercial Lot. As of January 1, 2010, according to the Property Appraiser of Palm Beach County, the Properties had an appraised value of $3,051,075.00 (the "Property Appraiser Valuation").

10.     While the Debtor recognizes that the appraised value of the Properties have declined since 2006, SOJO believes that through successful marketing of the Properties, a fair market value of the Commercial Lot would yield in excess of $1.5 Million with the Service Station having a fair market value of $3.0 to $3.5 Million.

11.     During the administration of the Chapter 11 proceeding, and in connection with the reorganization of the Business, the Debtor intends to market and liquidate the Commercial Lot through a Section 363 sale or abandon the property to PNC, thereby establishing its fair market value to reduce the current principal indebtedness of approximately $5 Million.

   **C.** **Events Leading to Chapter 11 Filing.**

**The Fidelity/PNC Loan Structure**

12.     On December 7, 2006, Fidelity, the predecessor in interest of PNC, made a construction loan to SOJO in the original principal amount of $4,765,000.00. As part of that transaction, SOJO executed a Promissory Note in the principal amount of $4,765,000.00 (the "Construction Loan" or "Note 1") with a conversion date of December 7, 2008 (the "Conversion Date"). Provided certain conversion conditions were met by that date, the loan would be converted to a permanent loan with a maturity date of December 7, 2033. If the conversion conditions were met, the period from the Conversion Date to December 7, 2003, would be referred to as the "Permanent Period."

13.     However, in the event that the conversion conditions were not met and there was no Permanent Period, the Construction Loan would mature on December 7, 2008. As such, the period from December 7, 2006, through and including December 7, 2008, was referred to as the "Construction Period."

14.     The Construction Loan contemplates monthly interest only payments at the rate of 7.367% from January 7, 2007 through the remainder of the Construction Period. On the Conversion Date, the outstanding balance and unpaid accrued interest would either become due in full, or convert to a permanent loan. If the Construction Loan were converted to a permanent loan, the interest rate would remain fixed for five (5) years at the rate of 7.367%, and convert to a variable interest rate for the remainder of the Permanent Period. However, in the event of a default under the

3

Construction Loan, it contemplates a default rate of interest of sixteen (16%) percent. Given current financial market conditions and lending rates, the Debtor contemplates a restructuring of the loan based upon more competitive interest rates.

15.     Also on December 7, 2006, Fidelity made a second loan to SOJO in the original principal amount of $395,000.00. As part of that transaction, SOJO executed a Promissory Note in the principal amount of $395,000.00 (the "Second Loan" or "Note 2") with a maturity date of December 7, 2016 (the "Note 2 Maturity Date"). The Second Loan contemplates interest only payments at the rate of 7.656%, beginning January 7, 2007, and continuing for five consecutive months, with principal plus unpaid accrued interest payments beginning July 7, 2007 and continuing until the Note 2 Maturity Date. However, in the event of a default under Second Loan, it contemplates a default rate of interest of sixteen (16%) percent.

16.     Also on December 7, 2006, Fidelity made a third loan to SOJO in the original principal amount of $200,000.00. As part of this transaction, SOJO executed a Promissory Note in the principal amount of $200,000.00 (the "Third Loan" or "Note 3"), with a maturity date of December 7, 2011 (the "Note 3 Maturity Date"). The Third Loan contemplates interest only payments at the rate of 8.75% beginning January 7, 2007, and continuing until the Note 3 Maturity Date. However, in the event of a default under the Third Loan, it contemplates a default rate of interest of sixteen (16%) percent. The Construction Loan, Second Loan and Third Loan shall be referred to collectively as the "Loans" or the "Notes".

17.     As security for the Note, and also on December 7, 2006, the Debtor executed a Mortgage, Security Agreement, Financing Statement and Assignment of Rents (the "Mortgage"), which provided Fidelity with a mortgage security interest in the Service Station and Commercial Lot. SOJO further executed and delivered to Fidelity a Construction Loan Agreement relating to construction costs of the Service Station and Commercial Lot.

18.     As additional security for the Loans, SOJO also executed an Assignment of Rents, Leases, Profits and Contracts (the "Assignment of Rents"), pursuant to which SOJO assigned to Fidelity, among other things, rents, income, receipts, revenues, issues and profits from the Service Station and Commercial Lot. The Notes, the Mortgage, the Construction Loan Agreement and the Assignment of Rents shall be referred to collectively as the "Loan Documents".

19.     The original intent behind the structuring of the Loan was to allow the Debtor a two (2) year Construction Period before payment on the outstanding principal would be due. Based on

4

the construction plans and budget for the Loan, the Debtor anticipated that the Service Station and Commercial Lot would be available for occupancy and fully operational by December 2007, giving SOJO a year before the Conversion Date to operate the Service Station and generate revenue, and market and sell the Commercial Lot.

### The Construction Delays and Budget Shortfall

20. Due to an unprecedented downturn in the economy, specifically the real estate and capital markets, and a budget shortfall of approximately $190,000.00 due to significant unforeseen costs caused by construction delays, the Debtor was not able to obtain a certificate of occupancy until May 2008. As a result, the Debtor had to forgo six (6) months of revenue, which was originally intended to pay down the Notes. Consequently, when SOJO finally opened the Service Station it was significantly behind schedule and further in debt than expected due to the budget shortfall. As a result, the Debtor was forced to allocate available funds to cover operational costs of the Business. Additionally, prior to or during the Construction Period, SOJO negotiated a sale of the Commercial Lot to Walgreen Co. ("Walgreens"), a national pharmacy chain. However, as a result of the economic recession, the deal never materialized. SOJO has since been actively marketing the Commercial Lot for sale, unfortunately, during one of the worst real estate markets in decades.

21. When the Debtor became aware of the budget shortfall on the Construction Loan, it attempted to contact Fidelity regarding an additional extension of credit. However, at that time, the Loans were transitioned by successive mergers from Fidelity to National City and eventually to PNC. As a result, the Debtor was unable to successfully negotiate obtain additional funding. Additionally, it is unclear whether Fidelity ever determined or notified the Debtor if the Note was eligible to be converted from the Construction Period to the Permanent Period. However, the Debtor did make a substantial lump sum payment of $30,000.00 on the Construction Loan in May 2008.

22. In addition to the debt owed to PNC, the Debtor owes approximately $600,000.00 in general unsecured debt.

23. The Debtor does not dispute that certain amounts due to PNC under the Loan Documents remain unpaid as of the Petition Date. However, even as the Service Station continues operating, the Debtor has been unable to pay the Note in full or obtain refinancing of the Loan, largely due to SOJO's continued efforts to sell the Commercial Lot.

### The Foreclosure Action

24. On June 21, 2010, PNC initiated foreclosure proceedings in the case styled *PNC*

*Bank, N.A., as successor to Fidelity Federal Bank & Trust v. SOJO, LLC, et al.*, Case No. 502010CA016143, pending in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County Florida, seeking to foreclose on the Service Station and Commercial Lot and all related personal property (the "Foreclosure Action"). In the Foreclosure Action, PNC asserts that it is owed principal in the amount of $5,269.970.80, interest in the amount of $923,161.75 and late fees in the amount of $12,165.28, for a total sum owed under the Loan in the amount of $6,215,207.27, which sum is disputed by the Debtor. The Debtor disputes, among other things, whether PNC, or its predecessors, have properly calculated interest and other charges and applied approximately $300,000.00 in interest reserves on the Loans and, therefore, seeks an accounting from PNC for purposes of determining the amount of the alleged indebtedness.

25.     On September 13, 2010, PNC filed its Motion for Entry of Final Judgment of Foreclosure in the Foreclosure Action.

26.     The Debtor commenced this bankruptcy case in order to restructure the secured debt held by PNC, so that the Service Station can continue to operate for the benefit of creditors of the Debtor's estate and allow the Debtor to sell the Commercial Lot and significantly reduce the amount of indebtedness due on the Loans. The Debtor expects to file a Plan of Reorganization expeditiously in order to further these goals in a cost effective and efficient manner.

**II.     CASH COLLATERAL AND THE RELIEF SOUGHT BY THE DEBTOR.**

27.     The Debtor's cash and other personal property (the "Collateral") is secured by several liens granted in favor of PNC, as successor in interest to Fidelity and National City, pursuant to the Uniform Commercial Code, Fla. Stat. §679.1011, et. seq.

28.     Any cash or cash equivalents, funds or proceeds of or from the Collateral may constitute PNC's cash collateral within the meaning of Section 363 of the Bankruptcy Code (the "Cash Collateral").

29.     The Debtor acknowledges that, in consideration of the Debtor's use of Cash Collateral, PNC, assuming that it is properly secured and perfected in the Cash Collateral, is entitled to adequate protection of its security interests in and liens on the Cash Collateral in accordance with 11 U.S.C. §§ 361 and 363 of the Code. In connection therewith, the Debtor seeks the use of Cash Collateral in its business operations and, as such, has agreed to provide adequate protection to PNC pursuant to the terms hereof in the form of, among other things, an administrative claim, certain adequate protection payments, a post petition replacement lien, and the preservation of the going

concern value of the Service Station and the liquidation value of the Commercial Lot.

30. In connection with the Debtor's use of Cash Collateral and to provide PNC with adequate protection in respect of the Debtor's use of such Cash Collateral as well as for any decrease in the value of its interests in the Cash Collateral as of the Petition Date, the Debtor has agreed, subject to approval of this Court, that PNC, shall have *nunc pro tunc* as of the commencement of the Chapter 11 case, (i) a replacement lien pursuant to 11 U.S.C. §361(2) on and in all property acquired or generated post petition by the Debtor to the same extent and priority and of the same kind and nature as PNC's pre-petition liens and security interests in the Cash Collateral; (ii) an administrative expense priority pursuant to Sections 507(a)(1) and 503(b) of the Bankruptcy Code for the diminution in the Cash Collateral by and through the Debtor's use thereof during these proceedings; (iii) adequate protection payments as set forth below; and (iv) the preservation of the going concern value of the Service Station and the fair market value of the Commercial Lot.

31. Further, the Debtor proposes to use the Cash Collateral strictly in accordance with the terms of that certain Budget prepared by the Debtor and to be filed with the Court (the "Budget"). A true and correct copy of the Budget is attached hereto as **Exhibit "A"**. The Budget covers the ninety day (90) period from the Petition Date through February, 2010. The Debtor also requests that it be authorized: (i) to exceed any line item on the Budget by an amount equal to ten percent (10%) of each such line item; and (ii) to exceed any line item by more than ten percent (10%) so long as the total of all amounts in excess of all line items for the Budget do not exceed ten percent (10%) in the aggregate of the total Budget.

32. As set forth in the Budget, the Debtor asserts that PNC's interest in Cash Collateral is fully protected and will not erode or decrease by virtue of the Debtor's use of such Cash Collateral. The adequate protection analysis contained in the Budget evidences that the aggregate value of cash increases over the term of the Budget.

33. Pursuant to the Budget, the Debtor has listed its anticipated sources of revenue and expected expenses in respect of the Collateral. After payment of all expenses listed in the Budget, the

Debtor anticipates that it will have a certain level of excess cash remaining on a periodic basis (the "Excess Cash"). The level of Excess Cash is likely to vary each month depending on sales and expenses. The Debtor proposes, as part of the adequate protection provided to PNC, to segregate the Excess Cash which shall be subject to PNC's replacement liens. Finally, the Debtor requests that the

replacement liens, administrative claims and adequate protection payments granted to PNC pursuant to the terms hereof be at all times subject and junior to: (i) the payment of professional fees and expenses allowed under Sections 330 and 331 of the Bankruptcy Code for professionals engaged by the Debtor and any official committee of unsecured creditors whose engagement has been approved by the Bankruptcy Court; and (ii) the fees of the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 (collectively, the "Carve Out").

34.     Supplemental to the replacement liens, administrative claims and other adequate protection payments provided to PNC hereunder, the Debtor will furnish PNC with such financial and other information as PNC reasonably requests regarding the going concern value of the Service Station and sale of the Commercial Lot.

35.     The replacement liens granted to PNC hereunder in connection with the use of the Cash Collateral shall be valid and perfected without the need for the execution or filing of any further documents or instruments.

36.     Due to the exigency of the within bankruptcy, the Debtor has only preliminarily reviewed the associated loan and security documents in connection with the loans from PNC. As such, while the Debtor assumes that PNC is properly perfected in the Cash Collateral for purposes of this Motion, the Debtor hereby reserves all of its rights to object to the extent, validity and priority of PNC's debt and the liens granted in connection therewith.

**III.    APPLICABLE AUTHORITY FOR RELIEF REQUESTED.**

    **A.    The Court Should Approve an Order Authorizing Use of Cash Collateral To The Extent That PNC Consents to Such Use.**

37.     A debtor's use of estate property is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides that a debtor may use estate property in the ordinary course of business without notice or a hearing. Section 363(c)(2) imposes specific limitations upon property that constitutes cash collateral and provides that a debtor can only use, sell or lease cash collateral either if the entity with an interest in the cash collateral consents or the Court authorizes such use. The Debtor has contacted PNC to explore an agreement regarding the use of Cash Collateral in this case. To the extent that the parties can reach such an agreement, this Court should approve the Debtor's use of PNC's Cash Collateral pursuant to Section 363(c)(2) of the Bankruptcy Code.

    **B.    The Court Should Enter an Order Authorizing the Continued Use of Cash Collateral Because the Debtor Is Providing VCI with Adequate Protection.**

38.     Pursuant to the terms hereof, the Debtor is providing and will provide adequate

8

protection to PNC as contemplated and required by Sections 361, 363(c)(2)(B) and 363(e), respectively, and hereby seeks the Court's approval thereof. The Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *See* 11 U.S.C. § 361. What constitutes adequate protection must be evaluated on a case-by-case basis. *In re Swedeland Dev. Group Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. l987)); *In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985).

39.     Adequate protection is meant to ensure that the secured lender receives the value for which it originally bargained. *Swedeland*, 16 F.3d at 564 (citing *O'Connor*, 808 F.2d at 1396) ("the whole purpose of adequate protection for a creditor is to ensure that the creditor receives the value for which he bargained pre bankruptcy"). Courts have noted that "the essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing . . . and the confirmation." *In re Arriens*, 25 B.R. 79, 81 (Bankr. D. Or. 1982). The focus of the requirement is to protect a secured creditor from diminution in value during the use period. *See In re Kain*, 86 B.R 506, 513 (Bankr. W.D. Mich.1988); *In re Becker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

40.     The Debtor's requested use of Cash Collateral and the protections afforded to PNC herein, including but not limited to an administrative claim, replacement lien, adequate protection payments and reporting, as well as the preservation of the ongoing value of the Service Station and liquidation of the Commercial Lot, in light of the circumstances, are reasonable, appropriate, and sufficient to satisfy the legal standard of "adequate protection" and will serve to maintain the value of PNC's Collateral.

    **C.**     **The Use of Cash Collateral Will Preserve the Debtor's Going Concern Value, Which Will Inure to the Benefit of Creditors.**

41.     The continued operation of the Debtor's business will preserve its going concern value, enable the Debtor to capitalize on that value through a reorganization strategy or sale, and ultimately enable the Debtor to confirm a Chapter 11 plan. However, as discussed above, if the Debtor is not allowed to use Cash Collateral, its business operations will be substantially interrupted and will likely shut down. This would result in a significant diminution in the value of the Debtor's assets to the detriment of the Debtor's creditors and the estate.

42. It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the business of the debtor as a going concern:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984).

43. Accordingly, courts authorize the use of cash collateral to enhance or preserve the Debtor's going concern value. For example, in *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the debtor's continued operations and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]" *Id.* at 460; *see also Federal Nat. Mort. v. Dacon Bolingbrook Assocs.*, 153 B.R. 204, 214 (N.D. Ill. 1993) (security interest protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Constable Plaza Assoc.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor's reinvestment of rents to maintain and operate office building "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"); *In re Dynaco Corp.*, 162 B.R. 389, 395-96 (Bankr. D.N.H. 1983) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); *In re Karl A. Neise, Inc.*, 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on postpetition property acquired by debtor; debtors can use cash collateral "in the normal operation of their business").

44. As discussed above, the Debtor will use Cash Collateral in the ordinary course of its business to, among other things, continue to operate and maintain its business, thereby solidifying the prospects of a successful reorganization. If the Debtor cannot continue to use Cash Collateral, it likely will be forced to cease operations and convert this case to Chapter 7. This cessation would irreparably damage the Debtor's business by causing, among other things, employee attrition, lost revenues, and loss of business reputation. By contrast, granting authority will allow the Debtor to maintain operations and preserve the going concern value of its business, which will inure to the benefit of PNC and all other creditors.

    **D.**     **PNC is Adequately Protected by the Grant of Replacement Liens on Post Petition Assets.**

45. The Bankruptcy Code expressly provides that "granting a replacement lien is a means of adequate protection." 11 U.S.C. § 361(2). Granting replacement liens provides ample adequate protection of the secured creditor's interest in cash collateral. *See, e.g., In re O'Connor*, 808 F.2d at 1393; *In re Dixie-Shamrock Oil & Gas. Inc.*, 39 B.R. 115, 118 (Bankr. M.D. Tenn. 1984). The Debtor will adequately protect PNC's interests in Cash Collateral by, among other things, providing post-petition security interests in the Debtor's assets of the same type as PNC held pre-petition to the extent the Debtor's use of Cash Collateral results in a post-petition decrease in the value of the Collateral securing PNC's claims. Such post-petition security interests will be of the same validity and priority as PNC's pre-petition liens and security interests.

  **E. PNC is Adequately Protected by the Administrative Priority Granted under Section 507(b) of the Bankruptcy Code.**

46. If the adequate protection described herein proves inadequate, as determined by the Court after notice and hearing, then to that extent, PNC will be granted an allowed administrative expense claim having the priority specified in Section 507(b) of the Bankruptcy Code.

  **F. PNC is Adequately Protected by the Adequate Protection Payments Provided for In The Budget.**

47. The Debtor proposes to make monthly adequate protection payments of $7,500.00 from the Excess Cash from the Business as it continues to operate. In the event of deterioration in the value of PNC's Collateral or Cash Collateral that is not adequately protected by the other grants of adequate protection herein, the payments shall compensate PNC for such deterioration. Otherwise, such payments shall be applied to PNC's allowed secured claim as required by the applicable provisions of the Bankruptcy Code. Pursuant to the Budget, the Debtor will have sufficient cash to make the proposed adequate protection payments.

48. The Debtor believes that use of Cash Collateral pursuant to the terms and conditions set forth above is fair and reasonable and adequately protects PNC. The combination of: (i) the Debtor's ability to liquidate the Commercial Lot and preserve the going concern value of the business with the use of Cash Collateral; (ii) the post-petition liens granted to PNC; (iii) providing PNC with the other protections set forth herein, including the availability of financial reporting and making adequate protection payments; and (iv) granting administrative priority under Section 507(b) of the Bankruptcy Code, adequately protects PNC's secured position under 11 U.S.C. §§ 361(2) and (3) of the Code. For all of the reasons stated above, this Court's approval of the Debtor's use of PNC's Cash Collateral is proper herein.

### G. Emergency Hearing Requested.

49. The Debtor respectfully requests that the Court set this Motion for hearing on an expedited basis. Of critical importance to the Debtor is the pre-petition payroll, fuel supply and vendor deliveries which must be funded to ensure continued operations of the Service Station. As such, there is a high likelihood of immediate and irreparable harm to the Debtor and the estate if the Debtor cannot use the Cash Collateral pending a final hearing hereon. Therefore, the Debtor respectfully requests a hearing on the earliest possible date on the Court's calendar.

**WHEREFORE**, the Debtor, SOJO, LLC, respectfully requests that the Court enter an order: (A) authorizing the Debtor (i) to use the Cash Collateral of PNC pursuant to the terms set forth above and in accordance with the Budget, (ii) to grant the administrative claim and replacement lien set forth above in connection with the use thereof, (iii) to make the adequate protection payments as set forth herein and (B) setting a final hearing hereon fifteen (15) days after the entry of an interim order on this Motion, and for such other and further relief as the Court deems just and proper.

**Dated this 22nd day of November, 2010.**

    Respectfully Submitted,

    **GENOVESE JOBLOVE & BATTISTA, P.A.**
    *Attorneys for Debtor-in-Possession*
    200 East Broward Blvd, Suite 1110
    Ft. Lauderdale, Florida 33301
    Telephone: (954) 453-8000
    Facsimile : (954) 453-80

    By: */s/* Barry P. Gruher
        Barry P. Gruher, Esq.
        Florida Bar No. 960993
        Alexandra D. Blye, Esq.
        Florida Bar No. 71499

## CERTIFICATE OF ADMISSION AND SERVICE

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion was served via electronic mail to: Robert N. Gilbert, Esq. rgilbert@carltonfields.com and Henry S. Wulf, Esq. hwulf@carltonfields.com, Carlton Fields, P.A., CityPlace Tower, 525 Okeecobee Boulevard, Suite 1200, West Palm Beach, Florida 3340; and all parties and counsel identified on the CM/ECF service list maintained by the Court in this case on the 22nd day of November, 2010.

By: /s/ Barry P. Gruher
Barry P. Gruher, Esq.

# EXHIBIT "A"

**SOJO, LLC**
Case No. 10-45753 - PGH
Debtor-in-Possession
Operating Budget

|  | 6 Months Ended June 30, 2010 | Adjustments | Adjusted | Monthly |
|---|---|---|---|---|
| **Gross Profit** | | | | |
| GP - Fuel | $ 72,974 | | $ 72,974 | $ 12,162 |
| GP - Store | 145,738 | | 145,738 | 24,290 |
| GP - Restaurant | 8,148 | | 8,148 | 1,358 |
| GP - Other | 17,495 | | 17,495 | 2,916 |
| **Total Gross Profit** | 244,355 | | 244,355 | 40,726 |
| | | | | |
| **Operating Expenses** | | | | |
| Accounting & Legal | 9,800 | (5,250) | 4,550 | 758 |
| Advertising & Promotion | 124 | (124) | - | - |
| Bank Charges | 2,445 | | 2,445 | 408 |
| Car Wash Expense | 526 | | 526 | 88 |
| Computer Service Fees | 2,517 | | 2,517 | 420 |
| Dues & Subscriptions | 2,059 | (300) | 1,759 | 293 |
| Payroll Taxes | 10,884 | (2,980) | 7,904 | 1,317 |
| Insurance | 23,556 | | 23,556 | 3,926 |
| Landscaping/Lawn Expense | 3,500 | (1,200) * | 2,300 | 383 |
| Payroll | 109,638 | (10,838) | 98,800 | 16,467 |
| Licenses & Misc. Taxes | 1,774 | (1,774) | - | - |
| Repairs & Maintenance | 5,134 | | 5,134 | 856 |
| Security | 381 | | 381 | 64 |
| Store Supplies | 122 | | 122 | 20 |
| Telephone | 2,447 | | 2,447 | 408 |
| Utilities | 21,431 | (600) * | 20,831 | 3,472 |
| Waste Removal | 1,308 | | 1,308 | 218 |
| **Total Operating Expenses** | 197,646 | | 174,580 | 29,097 |
| | | | | |
| **EBITDA** | $ 46,709 | | $ 69,775 | $ 11,629 |
| | | | | |
| Depreciation | $ 73,257 | | | |
| Interest Expense | $ 16,843 | | | |

\* Expenses on vacant land.

**SOJO, LLC**
Case No. 10-45753 - PGH
Debtor-in-Possession
3 Month Analysis of Operating Budget

|  | Dec 2010 | Jan 2011 | Feb 2011 | Total |
|---|---:|---:|---:|---:|
| **Gross Profit** | | | | |
| GP - Fuel | $ 12,135 | $ 12,160 | $ 12,160 | $ 36,456 |
| GP - Store | 24,290 | 24,290 | 24,290 | 72,869 |
| GP - Restaurant | 1,358 | 1,358 | 1,358 | 4,074 |
| GP - Other | 2,916 | 2,916 | 2,916 | 8,748 |
| Rebate * | 3,034 | - | - | 3,034 |
| **Total Gross Profit** | 43,733 | 40,724 | 40,724 | 125,180 |
| | | | | |
| **Operating Expenses** | | | | |
| Accounting & Legal | 758 | 758 | 758 | 2,275 |
| Advertising & Promotion | - | - | - | - |
| Bank Charges | 408 | 408 | 408 | 1,223 |
| Car Wash Expense | 88 | 88 | 88 | 263 |
| Computer Service Fees | 420 | 420 | 420 | 1,259 |
| Dues & Subscriptions | 293 | 293 | 293 | 880 |
| Payroll Taxes | 1,317 | 1,317 | 1,317 | 3,952 |
| Insurance | 3,926 | 3,926 | 3,926 | 11,778 |
| Landscaping/Lawn Expense | 383 | 383 | 383 | 1,150 |
| Payroll | 16,467 | 16,467 | 16,467 | 49,400 |
| Licenses & Misc. Taxes | - | - | - | - |
| Repairs & Maintenance | 856 | 856 | 856 | 2,567 |
| Security | 64 | 64 | 64 | 191 |
| Store Supplies | 20 | 20 | 20 | 61 |
| Telephone | 408 | 408 | 408 | 1,224 |
| Utilities | 3,472 | 3,472 | 3,472 | 10,416 |
| Waste Removal | 218 | 218 | 218 | 654 |
| Contingent Expenses | 2,500 | 2,500 | 2,500 | 7,500 |
| **Total Operating Expenses** | 31,597 | 31,597 | 31,597 | 94,790 |
| | | | | |
| Cash Flow from Operations | 12,136 | 9,127 | 9,127 | 30,390 |
| Less: Adequate Protection Payments | 7,500 | 7,500 | 7,500 | 22,500 |
| | | | | |
| **NET OPERATING CASH FLOW** | $ 4,636 | $ 1,627 | $ 1,627 | $ 7,890 |

\* Based on estimated Q4 2010 fuel sales (gallons sold).